IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 3, 2024

## STATE OF TENNESSEE v. MARCUS GREEN

**Appeal from the Criminal Court for Shelby County**
**Nos. C1806949, 18-05058  Lee V. Coffee, Judge**

_____

### No. W2022-01514-CCA-R3-CD
_____

The Defendant, Marcus Green, was convicted in the Shelby County Criminal Court of first degree premeditated murder, attempted first degree premeditated murder, employing a firearm during the commission of a dangerous felony, and possession of a firearm by a convicted felon.  After a sentencing hearing, he received a sentence of life plus one hundred five years in confinement.  On appeal, the Defendant contends that the evidence is insufficient to support the convictions, that the trial court erred by refusing to bifurcate the charge of possession of a firearm by a convicted felon from the remaining charges, and that his effective sentence is excessive.  Based upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR. J., delivered the opinion of the court, in which J. ROSS DYER and MATTHEW J. WILSON, JJ., joined.

Shae Atkinson (on appeal) and Juni Ganguli (at trial), Memphis, Tennessee, for the appellant, Marcus Green.

Jonathan Skrmetti, Attorney General and Reporter; Brooke Huppenthal, Assistant Attorney General; Steve Mulroy, District Attorney General; and Alanda Dwyer and James Thomas, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

In August 2018, the Shelby County Grand Jury returned a five-count indictment against the Defendant and his codefendant, Deonta Baskin.  The indictment charged the Defendant and Baskin with the first degree premeditated murder of Marceles Scurlock in

count one; the Defendant alone with the attempted first degree premeditated murder of Patricia Fisher in count two, employing a firearm during the commission of attempted first degree premediated murder in count three, and possession of a firearm by a convicted felon in count five; and Baskin alone with possession of a firearm by a convicted felon in count four.

The defendants were tried jointly in June 2022. After the reading of the indictment but prior to opening statements, the defendants, through their attorneys, pled guilty to possession of a firearm by a convicted felon in counts four and five and not guilty to the remaining charges. No colloquy was held and no judgments were entered regarding the pleas, and the trial court instructed the jury that the State still had to prove beyond a reasonable doubt that the defendants were guilty of possession of a firearm by a convicted felon.[1] The trial court later read a stipulation of fact for each of the defendants, providing that they previously had been convicted of felony crimes of violence and, therefore, could not lawfully possess a firearm.

Teresa Scurlock, Marceles Scurlock's mother, was the first witness to testify for the State. She identified photographs of Mr. Scurlock and said he was twenty-seven years old at the time of his death.

Officer Henry Hearns, a crime scene investigator with the Memphis Police Department ("MPD"), testified that on May 23, 2018, he responded to a shooting call at the Save Market on Oakwood Street. When he arrived, he collected evidence, photographed the crime scene, and prepared sketches of the area. Mr. Scurlock was deceased and was lying on Oakwood Street in front of the store. A "gold grill or teeth" and a pool of blood were on the ground near his body, and thirteen nine-millimeter cartridge cases and three projectiles were on the ground around his body. Officer Hearns found four possible bullet strikes in the pavement underneath the body. A Lexus was parked in front of the store, and a nine-millimeter cartridge case was on the ground near the back of the Lexus. Several bullet holes and additional projectiles were in the front wall of the store, near the front door. Officer Hearns collected a total of fourteen cartridge cases and five projectiles from the scene. A dumpster was outside the store, and a pizza box was in the dumpster. Latent fingerprints were on the pizza box.

On cross-examination by the Defendant, Officer Hearns testified that he received the shooting call at 6:17 p.m. and that he arrived at the Save Market at 6:28 p.m. Numerous

---

[1] We note that "[a]n acknowledgement of guilt is not the 'functional equivalent' of a guilty plea when the State is still tasked with proving the elements of the offense beyond a reasonable doubt." *McCathern v. State*, No. M2016-02143-CCA-R3-PC, 2017 WL 5462491, at *4 (Tenn. Crim. App. Nov. 14, 2017); *see also State v. Blocker*, No. W2020-00543-CCA-R3-PC, 2021 WL 3140357, at *12 (Tenn. Crim. App. July 26, 2021).

officers were already present, and Officer Hearns did not know what happened to evidence prior to his arrival. On cross-examination by Codefendant Baskin, Officer Hearns testified that he did not know if all of the cartridge cases were made by the same manufacturer or if the projectiles in the front wall of the store came from the cartridge cases. He acknowledged that nine-millimeter pistols generally held twelve rounds in the magazine and one round in the chamber. Thus, fourteen cartridge cases at the scene indicated that more than one gun was used in the shooting.

Officer Robert Davis of the MPD testified as an expert in latent fingerprint examination that he analyzed the latent fingerprints on the pizza box. The fingerprints matched the Defendant, Codefendant Baskin, and a man named Rasheed Martin. At the conclusion of Officer Davis's testimony, the trial court read two additional stipulations of fact to the jury: the fingerprints of the Defendant and Codefendant Baskin were on the pizza box.

Lieutenant Billy Byrd of the MPD testified that he responded to the scene and was the case coordinator. Mr. Scurlock was lying in front of a Lexus and was close to a dumpster. Lieutenant Byrd collected the store's surveillance video and video from a SkyCop camera. He also talked with witnesses, including people inside the store and Patricia Fisher. The store's surveillance video showed a man carrying a pizza box from the store and another man later throwing the pizza box into the dumpster. The police retrieved the box, obtained fingerprints on the box, and identified the Defendant and Codefendant Baskin from the fingerprints. The police prepared photograph arrays containing the Defendant's and Codefendant Baskin's photographs and showed the arrays to Ms. Fisher. The police also identified a suspect vehicle from the surveillance video. The vehicle was registered to Yolanda Wrushen.

The State played the store's surveillance video for the jury while Lieutenant Byrd narrated what he thought was depicted in the video. He said the video showed Codefendant Baskin carrying the pizza box out of the Save Market and the Defendant later throwing the box into the dumpster. Ms. Fisher got out of the Lexus and went into store. Mr. Scurlock got out of the Lexus and pulled up his shirt as he stood up, revealing he did not have a gun in his waistband. Ms. Fisher came out of the store and handed Mr. Scurlock a cigarette. Ms. Fisher walked back toward the store and had a conversation with the Defendant. The situation looked "a little heated." The Defendant approached Mr. Scurlock; pulled out a pistol; and pointed the gun at Mr. Scurlock, who had his hands up. Ms. Fisher tried to get away from them, and the Defendant fired the gun at her. Mr. Scurlock tried to get away from the Defendant, but Codefendant Baskin "interven[ed]." The Defendant struck Mr. Scurlock with the gun, Codefendant Baskin punched Mr. Scurlock, and the three men began struggling around the dumpster. Codefendant Baskin produced a firearm and

pointed it at Mr. Scurlock. Mr. Scurlock fell to the ground, and Codefendant Baskin continued shooting at him. The defendants then fled the scene.

Lieutenant Byrd testified that during the melee, a bloodstain appeared to form on Codefendant Baskin's shirt. Lieutenant Byrd later spoke with Ms. Wrushen and learned Codefendant Baskin had sustained two gunshot wounds. Lieutenant Byrd opined that Codefendant Baskin was shot accidentally either by the Defendant or by the ricochet of a bullet from Codefendant Baskin's gun as Codefendant Baskin was shooting Mr. Scurlock. Lieutenant Byrd said that he found two bullet holes in the front wall of the store and that the holes appeared to be "fresh." The police did not find a weapon on Mr. Scurlock, in the Lexus, or anywhere at the scene.

On cross-examination by the Defendant, Lieutenant Byrd testified that Ms. Fisher was not injured during the shooting and that he did not know if the Defendant shot Mr. Scurlock. On cross-examination by Codefendant Baskin, Lieutenant Byrd testified that he did not know how many bullets Codefendant Baskin or the Defendant fired. However, the video showed the Defendant firing at least one bullet toward the store.

Patricia Fisher testified that Mr. Scurlock was her boyfriend and that they had been dating about one and one-half years at the time of the shooting. On May 23, 2018, she and Mr. Scurlock drove her Lexus to the Save Market so she could buy cigarettes. Ms. Fisher went inside the store, purchased the cigarettes, and took them outside to Mr. Scurlock, who was sitting on the trunk of her car. Ms. Fisher saw a group of men, and Mr. Scurlock told her, "'What these [n*ggas] on? What they got going on. . . . They constantly circling the car.'" Ms. Fisher recognized one of the men as "Quentin" and a second man as Quentin's brother, whom she knew as "D." Three days earlier, Ms. Fisher and Mr. Scurlock had gotten into an argument at the store with Quentin and D because Quentin thought Mr. Scurlock was selling marijuana in Quentin's territory.

Ms. Fisher testified that she and Mr. Scurlock knew something bad was about to happen. A third man, whom she did not know but later learned was the Defendant, told her, "'You better get the [f*ck] down off my block. Get the [f*ck] from over here before it be a problem.'" The Defendant lifted his shirt, and Ms. Fisher saw a gun. Mr. Scurlock said to the Defendant, "'Damn, you gonna up a gun on my [b*tch]? Like, really, that's what you gonna do?'" The Defendant pointed the gun at Mr. Scurlock, and Mr. Scurlock told Ms. Fisher to run. Ms. Fisher ran inside the store as the Defendant shot at her. Ms. Fisher heard additional gunshots, but she did not see who was shooting.

Ms. Fisher testified that the police arrived and that she told them Quentin and D were involved in the shooting. Neither Mr. Scurlock nor Ms. Fisher had a gun at the time of the incident. Three days later, the police showed Ms. Fisher two photograph arrays, and

- 4 -

she identified the Defendant as the man who pointed the gun at Mr. Scurlock and Codefendant Baskin as one of the men who then "'ran up on'" Mr. Scurlock.

On cross-examination by the Defendant, Ms. Fisher denied that Mr. Scurlock went to the store on the day of the shooting to sell drugs. She said that she ran inside the store before the Defendant shot at her and that she was not injured. On cross-examination by Codefendant Baskin, Ms. Fisher testified that Mr. Scurlock already had his hands up when the Defendant pointed the gun at him. Ms. Fisher did not hear Codefendant Baskin say anything to Mr. Scurlock and did not see Codefendant Baskin fire a gun. However, she heard at least six gunshots. Ms. Fisher acknowledged that Mr. Scurlock was a "drug dealer" and that he sold crack cocaine.

On redirect examination, Ms. Fisher testified that her original argument was with Quentin and D and that she did not know the defendants prior to the shooting. The State asked if she thought Quentin or D called the defendants "over there," and she answered, "They definitely did." She said she never thought her argument with Quentin would result in the shooting.

Dr. Marco Ross, the Chief Medical Examiner at West Tennessee Regional Forensic Center, testified as an expert in forensic pathology that he performed Mr. Scurlock's autopsy. Mr. Scurlock's cause of death was multiple gunshot wounds, and his manner of death was homicide. Dr. Ross found thirty "defects" on Mr. Scurlock's body and one abrasion on his left hip. Mr. Scurlock sustained fifteen gunshot entry wounds to his left jaw, the front of his neck, his chest, and left arm. The bullets struck his heart, lungs, colon, spine, and a kidney. Dr. Ross collected a bullet from Mr. Scurlock's spine, two bullets from his back, and bullet fragments from his shirt. Most of the wounds on Mr. Scurlock's back were exit wounds; therefore, Mr. Scurlock may have been lying on his back when he was shot. Mr. Scurlock's toxicology results were positive for THC or marijuana.

On cross-examination by Codefendant Baskin, Dr. Ross testified that he found only one entrance wound on Mr. Scurlock's back. Dr. Ross acknowledged that Mr. Scurlock could have been standing when he sustained some of the gunshot wounds.

Yolanda Wrushen testified that she was Codefendant Baskin's ex-girlfriend and that she knew the Defendant because he was Codefendant Baskin's cousin. About 6:00 p.m. on May 23, 2018, Ms. Wrushen was on her way home from work and was driving near Oakland Street when she received a telephone call from Codefendant Baskin. He told her to look on Oakland to see if the police and yellow tape were present. He also told her, "'I killed that [n*gga].'" Ms. Wrushen saw the police and police tape. Codefendant Baskin sent photographs to Ms. Wrushen's cellular telephone, showing her gunshot wounds on his

body. She stated, "He said he got shot, and when he reached back, he felt something wet. And when he felt something wet, he went in on the guy."

Ms. Wrushen testified that Codefendant Baskin wanted her to help him with an attorney. She refused, and he told her, "'Don't play with [me]. [I'm] about that life.'" Codefendant Baskin said he would call her back, but she never heard from him. Lieutenant Byrd later showed Ms. Wrushen photographs of two men, and she identified them as Codefendant Baskin and the Defendant. She said that Codefendant Baskin was driving a vehicle registered to her on the day of the shooting and that she knew him to carry a gun. On cross-examination by Codefendant Baskin, Ms. Wrushen testified that he never said anything to her about Mr. Scurlock or planning to kill Mr. Scurlock.

Detective Joshua Fox of the Shelby County Sheriff's Office ("SCSO") testified that on June 21, 2018, he and his "team" tried to arrest Codefendant Baskin, who was a passenger in a Nissan Altima. The Altima fled, so Detective Fox chased it and blocked it with his Tahoe. Codefendant Baskin exited the Altima and ran. Detective Fox drew his weapon and ordered Codefendant Baskin onto the ground, and Codefendant Baskin complied. Deputy Jose Pedraza of the SCSO testified that on November 21, 2018, he learned the Defendant had been arrested in Chicago for the crimes in this case. Deputy Pedraza went to Chicago and returned the Defendant to Memphis. On cross-examination, Deputy Pedraza acknowledged that the Defendant did not attempt to flee.

Special Agent Brock Sain of the Tennessee Bureau of Investigation ("TBI") testified as an expert in firearms identification that a nine-millimeter semiautomatic pistol ejected a cartridge case every time a person pulled the trigger and a bullet fired. He received the following evidence for microscopic analysis: thirteen nine-millimeter cartridge cases and three bullets that were on the ground around Mr. Scurlock's body, one nine-millimeter Luger cartridge case that was on the ground near the rear of the Lexus, one bullet and one bullet core that were found at the crime scene, three bullets recovered from Mr. Scurlock during his autopsy, and bullet fragments recovered from Mr. Scurlock's shirt during his autopsy. Special Agent Sain concluded that the thirteen cartridge cases around Mr. Scurlock's body were all fired from the same gun but that the cartridge case near the back of the Lexus was fired from a second gun. The three bullets recovered from Mr. Scurlock and the three bullets on the ground around his body had similar class characteristics; therefore, they could have been fired from the same gun. However, Special Agent Sain did not have enough information to make a conclusive determination. The additional bullet recovered at the crime scene was different from the other six bullets and could have been fired from a second firearm. The bullet core and bullet fragments did not bear any marks for analysis. Special Agent Sain acknowledged that two guns were used during the shooting. The cartridge case near the rear of the Lexus was consistent with the gunshot

fired at Ms. Fisher by the Defendant, and the cartridge cases found around Mr. Scurlock's body were consistent with a second gun firing at Mr. Scurlock.

On cross-examination by Codefendant Baskin, Special Agent Sain testified that he could not determine which bullets came from which cartridge cases. Thus, he could not say the bullets recovered from Mr. Scurlock's body came from the cartridge cases that were around his body.

At the conclusion of Special Agent Sain's testimony, the State rested its case. The defendants did not present any proof, and the jury convicted them as charged in the indictment.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant claims that the evidence is insufficient to support his conviction of first degree premeditated murder because he did not shoot Mr. Scurlock and because he was not criminally responsible for Codefendant Baskin's shooting Mr. Scurlock when the State failed to present any proof that he directed or encouraged Codefendant Baskin to shoot Mr. Scurlock. In support of his argument, the Defendant asserts that if he had wanted to kill Mr. Scurlock, he was holding a loaded gun and could have shot and killed Mr. Scurlock himself. The Defendant also claims that the evidence is insufficient to support his conviction of attempted first degree premeditated murder because he fired only one "wild" shot at Ms. Fisher, and the State failed to present any proof that the bullet almost struck her. Finally, the Defendant claims that because the evidence is insufficient to support his conviction of attempted first degree murder, the evidence also must be insufficient to support his conviction of employing a firearm during the commission of attempted first degree murder. The State argues that the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

- 7 -

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

First degree premeditated murder is defined as "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). Premeditation requires that the act be "done after the exercise of reflection and judgment" and committed when the accused "was sufficiently free from excitement and passion as to be capable of premeditation." *Id*. at § 39-13-202(e). Whether premeditation exists is a factual question for the jury to determine from all the evidence, including the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). As instructed to the jury, criminal attempt occurs when a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3).

Our supreme court has provided a non-exclusive list of factors from which a jury may infer premeditation, including the defendant's declarations of an intent to kill, evidence of the procurement of a weapon, the defendant's use of a weapon on an unarmed victim, the particular cruelty of the killing, evidence of the infliction of multiple wounds, the defendant's preparation before the killing to conceal the crime, destruction or secretion of evidence after the killing, and the defendant's calmness immediately after the killing. *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). Additional evidence from which a jury may infer premeditation is establishment of a motive for the killing. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The jury was instructed on criminal responsibility for first degree murder and attempted first degree murder. "A person is criminally responsible as a party to an offense,

if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . the person solicits, directs, aids, or attempts to aid another person to commit the offense." *Id*. at § 39-11-402(2).

In Tennessee, it is a crime to employ a firearm during the commission of or the attempt to commit a dangerous felony. *Id*. at § 39-17-1324(b)(1), (2). Attempted first degree murder is defined as a dangerous felony. *Id*. at § 39-17-1324(i)(1)(A).

The most significant evidence in this case was the store's surveillance video, which the State played for the jury and we have reviewed. The video, which is in color but does not have audio, is disturbing. It shows that Ms. Fisher and the Defendant were standing on the top step outside the store and that Mr. Scurlock was sitting in the driver's seat of Ms. Fisher's car. The Defendant said something to Ms. Fisher. Mr. Scurlock got out of the car, and the Defendant lifted his shirt, revealing a gun in his waistband. The Defendant pulled the gun out of his pants, and Mr. Scurlock immediately put his hands up while Ms. Fisher walked down the steps to the passenger door of her car. The Defendant walked down the steps and walked around the back of the car. He approached Mr. Scurlock, who was still standing by the driver's door. The Defendant raised the gun and pointed it at Mr. Scurlock's head, and Ms. Fisher turned away from the car and walked back toward the store. As Ms. Fisher entered the store, the Defendant pointed the gun at her, and he appeared to fire. A crime scene sketch of the front of the store prepared by Officer Hearns and introduced into evidence at trial showed a bullet hole just to the right of the front door. The Defendant then pointed the gun back at Mr. Scurlock. Mr. Scurlock walked to the front of the car, but Codefendant Baskin grabbed him and held him while the Defendant walked up to him and hit his head with the gun. The three men began struggling, and Codefendant Baskin punched Mr. Scurlock's head with his fist. Codefendant Baskin pulled a gun out of his pants and began shooting Mr. Scurlock, who fell to the ground. Codefendant Baskin continued shooting Mr. Scurlock while Mr. Scurlock was lying on his back. After the shooting, the Defendant and Codefendant Baskin ran across the street to a silver car and fled the scene.

Taken in the light most favorable to the State, the evidence shows that Quentin and D were upset with Ms. Fisher and Mr. Scurlock because they thought Ms. Fisher was selling marijuana at the store, which was in Quentin's territory. Three days later, the Defendant and Codefendant Baskin were at the store with Quentin and D when Ms. Fisher and Mr. Scurlock arrived to buy cigarettes. Although Ms. Fisher and Mr. Scurlock did not know the Defendant and had never seen him previously, the Defendant accosted them with a gun and told them to get off his block. The Defendant approached Mr. Scurlock, pointed

- 9 -

the gun at Mr. Scurlock's head, and shot at Ms. Fisher when she ran inside the store. The Defendant then beat Mr. Scurlock with the gun, and Codefendant Baskin shot Mr. Scurlock fifteen times.

The Defendant claims he was not criminally responsible for Codefendant Baskin's actions. However, the evidence established that the Defendant, at a minimum, threatened to shoot Mr. Scurlock, and that Codefendant Baskin grabbed and held Mr. Scurlock for the Defendant while the Defendant beat Mr. Scurlock. Both of the defendants struggled with Mr. Scurlock, and they fled the scene together after Codefendant Baskin shot Mr. Scurlock. Therefore, we have no hesitation in concluding that the evidence is sufficient to support the Defendant's convictions for the first degree murder of Mr. Scurlock, the attempted first degree murder of Ms. Fisher, and employing a firearm during the commission of attempted first degree murder.

## II. Bifurcation

The Defendant claims that the trial court erred by refusing to bifurcate the count for possession of a firearm by a convicted felon from the remaining counts of the indictment. The State argues that the trial court did not err. We agree with the State.

The record reflects that the Defendant filed a pretrial motion to bifurcate the charge of possession of a firearm by a convicted felon from the remaining charges, that the trial court held a hearing, and that the trial court denied the motion.[2] During the trial, the trial court read the following stipulation to the jury:

> [The Defendant] has entered a plea of guilty to convicted felon in possession of a firearm. It is therefore stipulated or agreed by all parties that on the date of this incident, May 23, 2018, [the Defendant] had been previously convicted of the felony convictions involving violence to the person enumerated in Count 5 of indictment 18-05058. It is stipulated, or agreed, that each element of count 5, convicted felon in possession of a firearm[,] has been proven beyond a reasonable doubt.

The trial court contemporaneously instructed the jury, and again during the final charge, that the jurors could consider the stipulation only to determine whether the State had proven beyond a reasonable doubt the elements of possession of a firearm by a convicted felon.

---

[2] The appellate record does not include the motion to bifurcate or a transcript of the motion hearing. However, the trial court referred to the motion to bifurcate during the hearing on the Defendant's motion for new trial, and this court entered an order allowing the Defendant to supplement the record with a statement of the evidence pursuant to Tennessee Rule of Appellate Procedure 24(c).

The Defendant raised the bifurcation issue in his motion for new trial. At the hearing on the motion, the trial court recalled denying the motion to bifurcate pursuant to *State v. James*, 81 S.W.3d 751 (Tenn. 2002). The trial court then explained,

> There have been some reported and unreported cases in the Court of Criminal Appeals that indicates that it might be a better practice to sever or bifurcate that issue. But [*State v. James*] says that the element of being a convicted felon is, in fact, an element of the offense. And the State of Tennessee has the right to present their proof to show that he is, in fact, a convicted felon.

> [*James*] says an offer to stipulate to those convictions is, in fact, sufficient, and that the State of Tennessee would not be able to tell the jury exactly what those convictions are.

The trial court also quoted this court's observation in *State v. Johnson*, No. W2018-01222-CCA-R3-CD, 2019 WL 6045569, at *13 (Tenn. Crim. App. Nov. 14, 2019), "that no procedure has been prescribed by this court or our supreme court for bifurcation proceedings in contexts involving a charge of possessing a firearm as a convicted felon." The trial court noted that the Defendant stipulated to being a convicted felon, that the stipulation did not inform the jury of the specific felonies, and that the trial court instructed the jury to consider the Defendant's having prior convictions for crimes of violence only for the purpose of determining whether he was guilty of possession of a firearm by a convicted felon. Accordingly, the trial court found that the Defendant was not entitled to a new trial based on the bifurcation issue.

Relevant to this case, Tennessee Code Annotated section 39-17-1307(b)(1)(A) provides that a person commits an offense "who unlawfully possesses a firearm" and "[h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon." The indictment alleged that the Defendant had four qualifying prior felony convictions: three counts of aggravated assault in 2005 and one count of aggravated assault in 2007.

"Rulings on the admissibility of evidence are largely within the sound discretion of the trial court." *James*, 81 S.W.3d at 760 (citing *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997)). "Bifurcation concerns splitting a charge into two separate determinations involving guilt and punishment by the same jury." *State v. Richardson*, No. W2016-02227-CCA-R3-CD, 2018 WL 821775, at *15 (Tenn. Crim. App. Feb. 9, 2018). A trial court may order bifurcation when "necessary 'in order to avoid undue prejudice.'" *Johnson*, No. W2018-01222-CCA-R3-CD, 2019 WL 6045569, at *13 (quoting *State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009)). Bifurcation is "the better procedure [when] the defendant

- 11 -

is charged with offenses involving the use of violence and force and also charged with the status offense of unlawful possession of a firearm for having a similar prior felony conviction." *State v. Foust*, 482 S.W.3d 20, 46-47 (Tenn. Crim. App. 2015).

Nevertheless, our supreme court has stated that "the name or nature of crimes other than that for which the defendant is on trial is relevant to establish an essential element of the crime for which the defendant is being tried." *James*, 81 S.W.3d at 760. Moreover, this court stated in *Johnson* that stipulating to prior felonies also is a "valid avenue[]" for a defendant charged with possession of a firearm by a convicted felon. No. W2018-01222-CCA-R3-CD, 2019 WL 6045569, at *14. Since *Johnson*, this court has continued to hold that bifurcation is not required. *State v. Howard*, No. W2020-00207-CCA-R3-CD, 2021 WL 144235, at *3 (Tenn. Crim. App. Jan. 15, 2021) (citing *State v. Buchanan*, No. M2017-02268-CCA-R3-CD, 2019 WL 852192, at *6 (Tenn. Crim. App. Feb. 21, 2019); *Richardson*, No. W2016-02227-CCA-R3-CD, 2018 WL 821775, at *16; *State v. Carter*, No. M2014-01532-CCA-R3-CD, 2016 WL 7799281, at *27 (Tenn. Crim. App. Mar. 8, 2016), *overruled on other grounds by State v. Menke*, 590 S.W.3d 455, 468 (Tenn. 2019)).

Here, the trial court allowed the Defendant to stipulate to having prior felony convictions involving violence, and the stipulation did not inform the jury of the Defendant's four convictions of aggravated assault. The trial court instructed the jury twice, contemporaneously after reading the stipulation and again in the final jury charge, that the jurors could only consider the prior convictions for determining whether the elements of possession of a handgun by a convicted felon had been proven beyond a reasonable doubt. We generally presume that a jury has followed the trial court's instructions. *See State v. Butler*, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Thus, we conclude that the trial court did not abuse its discretion by denying the Defendant's motion to bifurcate. Regardless, given the evidence, particularly the video of the shooting, we conclude that any error was harmless. *See* Tenn. R. App. P. 36(b).

## III. Excessive Sentence

Finally, the Defendant claims that his sentence of life plus one hundred five years is excessive because it equates to three life sentences. He asserts that even if he had received just one life sentence, he would be more than ninety years old upon his release from confinement and no longer would be a threat to the community. The State argues that the trial court properly sentenced the Defendant. We agree with the State.

After the jury convicted the Defendant, the trial court immediately sentenced him to life in confinement for the conviction of first degree premeditated murder and scheduled a sentencing hearing for the remaining convictions. No witnesses testified at the sentencing hearing, but the State introduced the Defendant's presentence report into evidence. The

report showed that the Defendant was forty-three years old, that he had three children who ranged in age from three to twenty-eight years old, and that he dropped out of high school in the tenth grade but obtained his GED in 2012 while in confinement. He also completed the programs Life Without a Crutch and Cage Your Rage in 2009 and 2007, respectively. In the report, the Defendant stated that he formerly was affiliated with the Gangster Disciples but that he had not participated in any gang-related activities since 2011. The Defendant described his physical and mental health as "good" and stated that he had never consumed alcohol but that he last smoked marijuana in 2018. The report showed that the Defendant worked as a warehouse employee for Staffline for two days in January 2018, that he worked as a meat cutter for Superlo Foods for three months in 2004 to 2005, and that he worked as a cook and cashier for Mrs. Winner's Chicken for ten months in 2004.

The report showed that the Defendant had fourteen prior felony convictions: four convictions for aggravated assault, two convictions for drug offenses, five convictions for theft, two convictions for weapon offenses, and a conviction for evading arrest. Some of the felony offenses were committed when the Defendant was seventeen years old, and he was transferred to criminal court. The report also showed that the Defendant had nine prior misdemeanor convictions and violated probation at least one time. The Defendant's Strong-R assessment classified his risk to reoffend as moderate. The State also introduced some of the Defendant's prior judgments of conviction into evidence. One of the judgments shows that the Defendant was convicted of possession of a weapon by a convicted felon in 2001.

The trial court stated that it had considered the evidence presented at trial, the principles of sentencing, the statements and arguments by counsel, the nature and characteristics of the conduct involved in the crimes, the Defendant's presentence report and Strong-R assessment, statistical data for similar offenses provided by our supreme court, and the Defendant's potential for rehabilitation or treatment. The trial court found the following enhancement factors applicable to the Defendant's convictions: (1) "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (2) "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors"; (3) "[t]he offense involved more than one (1) victim"; (8) "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community"; (10) "[t]he defendant had no hesitation about committing a crime when the risk to human life was high"; and (11) "[t]he felony resulted in death or serious bodily injury, or involved the threat of death or serious bodily injury, to another person, and the defendant has previously been convicted of a felony that resulted in death or serious bodily injury." Tenn. Crim. App. § 40-35-114(1), (2), (3), (8), (10), (11). The trial court also found that enhancement factor (9), the defendant possessed or employed a firearm during the commission of the offense, applied to the Defendant's conviction of attempted first degree murder. *See id*. at

§ 40-35-114(9). The trial court gave great weight to factors (1), (3), (8), (9), (10), and (11) and found that no mitigating factors were applicable. The trial court noted that the Defendant now had eighteen felony convictions and that he had been committing violent crimes his entire adult life.

The trial court sentenced the Defendant as a Range III, persistent offender to sixty years for attempted first degree murder, a Class A felony, in count two; as a career offender to fifteen years for employing a firearm during the commission of attempted first degree murder, a Class C felony, in count three; and as a Range III, persistent offender to thirty years for possession of a weapon by a convicted felon, a Class B felony, in count five. The trial court noted that the Defendant was required to serve the fifteen-year sentence consecutively to the sixty-year sentence. *See id*. at § 39-17-1324(e)(1), (j).

Addressing additional consecutive sentencing, the trial court noted that the Defendant had been in adult court since he was seventeen years old and stated that his record was "one of the worst that I've seen in 40 years of practicing law." The trial court found that the Defendant "is an offender whose record of criminal activity is extensive." *Id*. at § 40-35-115(b)(2). The trial court also found that the Defendant "is a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." *Id*. at § 40-35-115(b)(2), (4). The trial court specifically addressed *State v. Wilkerson*, 905 S.W.3d 933, 938 (Tenn. 1995), and found that consecutive sentencing was necessary to protect the public from the Defendant and that consecutive sentencing reasonably related to the severity and the seriousness of the offenses.

This court reviews the length, range, and manner of service imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). The trial court is granted broad discretion to impose a sentence anywhere within the applicable range and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. We, likewise, review the trial court's order of consecutive sentencing for abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. *See State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013) (applying the same deferential standard announced in *Bise*, 380 S.W.3d at 682, to the trial court's consecutive sentencing decisions).

In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5)

evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Defendant in his own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98.

Initially, we note that the Defendant does not contest the trial court's application of any enhancement factors but that the trial court misapplied enhancement factors (3), (9), and (11). The trial court applied enhancement factor (3), the offenses involved more than one victim, because other people were in front of the store and were inside the store at the time of the shooting. However, this court has stated that a "victim" as used in enhancement factor (3) "is limited in scope to a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime." *State v. Raines*, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994). No one other than the named victims, Mr. Scurlock and Ms. Fisher, qualify as a "victim" for purposes of enhancement factor (3). Therefore, the trial court erred. The trial court also could not apply factor (9), the Defendant employed a firearm during the commission of the offense, to the Defendant's conviction of attempted first degree murder because the Defendant was indicted and separately convicted of employing a firearm during the commission of attempted first degree murder. *State v. Swift*, No. W2013-00842-CCA-R3-CD, 2015 WL 2128782, at *19 (Tenn. Crim. App. May 5, 2015). The trial court applied enhancement factor (11), the felony involved the threat of death or serious bodily injury, to another person, and the defendant previously had been convicted of a felony that resulted in death or serious bodily injury, because the Defendant had previous convictions of aggravated assault. Enhancement factor (11), though, expressly requires that the previous felony "resulted in death or serious bodily injury." The State did not present any evidence at sentencing that the Defendant's prior aggravated assault convictions resulted in serious bodily injury. *See* Tenn. Code Ann. § 39-13-102(a)(1)(A) (providing that a person commits aggravated assault by committing an assault that results in serious bodily injury or death, involves the use or display of a deadly weapon, or involves strangulation or attempted strangulation). Despite the trial court's misapplication of three enhancement factors, the trial court properly applied the remaining enhancement factors and gave three of them great weight, which justified the Defendant's sixty-, thirty-, and fifteen-year sentences. *See Bise*, 380 S.W.3d 709-10 (holding that despite the misapplication of an enhancement factor, a sentence "should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute").

As to consecutive sentencing, Tennessee Code Annotated section 40-35-115(b) lists the discretionary criteria for imposing consecutive sentencing. Because the criteria for determining consecutive sentencing "are stated in the alternative[,] . . . only one [criterion]

need exist to support the appropriateness of consecutive sentencing." *State v. Mickens*, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003).

In this case, the trial court imposed consecutive sentencing first upon finding that the Defendant had an extensive criminal history. We agree with the trial court. The Defendant's criminal history is extensive, showing that he has been committing adult crimes since he was a teenager.

The trial court also imposed consecutive sentencing upon finding that the Defendant is a dangerous offender. In order to impose consecutive sentencing on that basis, a trial court must find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and [that] (2) 'the terms are reasonably related to the severity of the offenses.'" *State v. Moore*, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting *Wilkerson*, 905 S.W.2d at 938). The trial court specifically addressed and found the *Wilkerson* factors applicable. Starting with the Codefendant, the trial court stated:

> The court also finds that the aggregate length of sentences in this case reasonably relate to the severity of the offense for which [the Codefendant] stands convicted, and consecutive sentences are necessary to protect the public from further criminal acts by [the Codefendant].
>
> And those findings are made pursuant to those additional findings that the Court has to make pursuant to State versus Wilkerson, W-I-L-K-E-R-S-O-N, 905 S.W.2d, Page 933, 1995 Tennessee Supreme Court opinion.

The trial court then applied the same factors to the Defendant stating:

> He also had no hesitation in committing a crime in which the risk to human life was high. He is, in fact, a dangerous offender. I put the case on the record earlier, the [W]ilkerson case. will adopt that -- will adopt the citation.

The trial court then explained:

> The facts and circumstances surrounding the commission of this offense are, in fact, aggravated. And the aggregate length of sentences in this case has to reasonably relate to the severity of the offenses for which the Defendant has been convicted. And the court finds that consecutive sentences are, in fact, necessary to protect this community.

As to this Defendant, the trial court concluded:

[A] judge has told [the Defendant], at least, 14 times before this sentencing, you cannot possess, you cannot carry, you cannot buy, you cannot own any handguns, firearms, rifles, shotguns, pistols, ammunition, or even a bullet.

And [the Defendant] continued to arm himself with a gun. Had a gun stuffed in his waistband, standing outside of a public place. Pulled that gun. Shot at a person. Put the gun [to] the head of another person. Engaged in firing multiple shots.

And I don't know if [the Defendant's or the Codefendant's] guns are the one which caused the death of Marceles Scurlock, but they are equally responsible. Fired multiple shots into the body of this man as he lay prone on the ground.

And if consecutive sentencing for a person, who now has at least 18 felony convictions, has been convicted of gun offenses, starting being convicted of gun offenses at the age of 13, transferred to criminal court at the age of 17 because he continued to carry guns and commit crimes of violence, if consecutive sentencing is not the appropriate sentence in this case for [the Defendant], there, again, is no person for whom consecutive sentencing should, in fact, be applicable.

The trial court explained its reasoning for ordering consecutive sentencing, and we again agree with the trial court. The Defendant has been in and out of confinement since he was seventeen years old. Yet, he has continued to commit serious offenses in middle age. Those offenses now include the first degree murder of Mr. Scurlock and the attempted first degree murder of Ms. Fisher, neither of whom the Defendant knew previously. We conclude that the trial court did not abuse its discretion by imposing a sentence of life plus one hundred five years in confinement.

## CONCLUSION

Upon review, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE

- 17 -